Ulysses ODOM, Plaintiff,

v.

Anthony J. CELEBREZZE, Secretary of Health, Education, and Welfare, Defendant.

Civ. A. No. 8122.

United States District Court
E. D. South Carolina,
Charleston Division.

June 12, 1964.

A. Arthur Rosenblum, Charleston, S. C., for plaintiff.

Terrell L. Glenn, U. S. Atty., Columbia, S. C., and Thomas P. Simpson, Asst. U. S. Atty., Charleston, S. C., for defendant.

DALTON, District Judge.

This proceeding is brought pursuant to Section 205(g) of the Social Security Act as amended (42 U.S.C.A. § 405(g)) to obtain judicial review of the final administrative action by the Secretary of Health, Education and Welfare, disallowing the plaintiff's application for the establishment of a period of disability and for disability insurance benefits under Sections 216(i) and 223 of the Act, respectively. (42 U.S.C.A. §§ 416 (i), 423).

The plaintiff, Ulysses Odom, was employed by the Pittsburgh Metallurgical Company as a fork-lift truck operator. While engaged in his employment on April 21, 1960, a steel beam fell on him, severely injuring his right leg and causing compression fractures in the sixth, eighth, and eleventh thoracic vertebrae.

Odom filed an application for disability benefits on March 12, 1962, alleging that he became disabled within the meaning of the Act on April 21, 1960, as a result of injuries sustained in the accident on that date. His application was denied initially and again, upon reconsideration, by the Bureau of Old-Age and Survivor's Insurance of the Social Security Administration. He then appeared before a hearing examiner of the Bureau of Hearings and Appeals who considered the case

*de novo* and held that the plaintiff had not established impairments of such severity as to preclude him from engaging in any substantial gainful activity at any time during which his application was effective.

On August 2, 1963, the Appeals Council of the Social Security Administration refused to review the hearing examiner's decision. Thus, the findings of the hearing examiner became the "final decision" of the Secretary of Health, Education and Welfare, which is now properly subject to review by this Court.

The plaintiff was born on October 18 1920. He completed only the second grade in school and has had no vocational education or other formal job training. Prior to the injuries sustained in the industrial accident referred to above, his health had been essentially good. At the time of the accident he was attended by Dr. O. S. Reeder in the County Emergency Room and then admitted to the McClennan-Banks Hospital in Charleston, South Carolina. X-rays were taken of the injured areas and the following diagnoses were made:

"(1) Compound comminuted [splintered] fractures, left tibia and left fibula.[1]

(2) Compression fractures, 6th, 8th, and 11th thoracic vertebrae." (Tr. 82)

The vertebrae fractures were treated by bed rest but the leg fractures required insertion of Steinman pins in the bone of the heel and in the upper tibia, and the application of a long leg cast. It appears that the leg fractures were extremely slow in healing due to the splintered condition. X-ray pictures taken April 22 showed that the angulation in the tibia fracture had been completely reduced but with a slight override, the lower fragment being only slightly to the side and back in relation to the upper fragment allowing eighty percent contact between them. The fibula fragments

---

1. Apparently, there was a typographical error in the report by Dr. Reeder since all other evidence in the record indicates the involvement of the right leg rather than the left.

were reported in "excellent position" according to Dr. F. H. Gruber, the radiologist. X-rays of the compression fractures of the three vertebrae on April 27 disclosed narrowing of the front of these bodies with irregularities in the cortexes. X-rays of this date also showed the development of a slight angulation in the fracture of the tibia. There was no evidence of bone destruction or osteomyelitis. On May 5, there was still a slight angulation and override noted in the tibia fracture with seventy-five percent contact. The overall impression was that the fragments were in good position. On June 3, X-rays showed no change in position of the fractures. There was no bony union as yet and the presence of a small metallic foreign body was reported adjacent to the fracture site of the tibia.

The plaintiff was discharged from the hospital on June 16, 1960, but due to the slow healing of the fractures the use of a full leg cast was continued for many months thereafter. By March 1961 he was ambulatory with the use of crutches and a walking type cast. In May 1961 the walking type casts were discontinued and physiotherapy was begun to limber up the knee and ankle. A short steel leg brace was being used and the leg was partially weight bearing with the use of crutches. (Tr. 82, 87). The report of August 2, 1961, from Dr. Reeder concluded that weight bearing without crutches was being gradually increased with continuing use of the steel brace and that when healing of the bone was complete Odom would be ready for return to work. (Tr. 82). The use of crutches was discontinued on or about August 14, 1961.

Odom was seen in October 1961 by Dr. R. H. Belser. At that time he complained of pain and stiffness in the right ankle and occasional pinching pains in the upper back. Dr. Belser's examination of the spine revealed no limitation of motion or deformity and no muscle spasms. There was local tenderness over the outgrowth of the mid thoracic vertebra. Examination of the legs indicated they were of equal length but with considerable atrophy of the right leg. There was no tenderness of the fracture sites but there was a twenty percent limitation of right knee flexion and persistent swelling about the ankle with fifty percent limitation in motion. X-rays showed that the fractures had healed in excellent position but there was considerable osteoporosis consistent with prolonged disuse. X-rays of the spine showed that the compression fractures appeared healed and without indications of arthritis. Dr. Belser was of the opinion that Odom had reached maximum improvement with partial permanent disability of approximately twenty percent in the spine and forty-five percent in the right leg. (Tr. 85).

In a letter dated October 19, 1961, Dr. Reeder reported the above permanent partial disabilities to the Pittsburgh Metallurgical Company and stated that in his opinion Odom had received maximum benefit from treatment and is now ready to return to work with duties under his regular job classification. Evidence was introduced at the hearing, however, to the effect that this report by Dr. Reeder was the result of an agreement between plaintiff and Dr. Reeder to allow plaintiff to attempt to get back to work in order to retain his seniority. (Tr. 38). It appears that Odom would lose his seniority privileges if he remained out of work for more than eighteen months. According to his testimony, Odom then returned to his former employer and was told by the personnel manager, after being seen by a company doctor, that he did not think there were any jobs available that plaintiff could do.

Dr. Reeder's findings as a result of examinations in October and November 1961 were substantially the same as those reported by Dr. Belser in October of that year. Two injections of hydrocortisone were made in the right ankle in November 1961 by Dr. Reeder for the purpose of relieving pain. The results of these injections were only partially successful and plaintiff continued having pain in his right ankle. (Tr. 89). On May 4, 1962, it was still necessary for the plain-

tiff to wear his leg brace. The pain was reportedly due to the restrictions of motion in the ankle and osteoarthritic changes resulting from the fracture. There were also reports of continuing pain in the upper back after prolonged standing. (Tr. 90–93). These conditions, according to Dr. Reeder, resulted in restricting Odom's capacity for walking, stooping and bending; affecting his endurance, agility and coordination. (Tr. 94). In later medical evidence it appears that Dr. Reeder had suggested that the ankle joint be fused if the symptoms continued.

Dr. John Siegling, an orthopedic surgeon, examined plaintiff for the first time on September 24, 1962. Dr. Siegling felt that he had traumatic arthritis in the knee and ankle joints and that he was still ailing from the residual back trouble. He expressed the opinion that it would be very difficult for plaintiff to obtain employment in any other than a very light work category. He estimated that there was a functional impairment of fifty percent in the right leg and twenty percent in the back and concluded that the total of the two disabilities would disbar him from any work. (Tr. 97).

However, Dr. Reeder, the treating physician, had seen plaintiff several days earlier and found what was apparently a marked improvement in plaintiff's condition since he had last been seen by Dr. Reeder. Dr. Reeder stated:

"This patient told me repeatedly for months that he had pain in his ankle at all times, but on September 20, he stated that at the present time he is having pain in his ankle only when he walks without his brace."

According to Dr. Reeder, X-rays taken at this time showed that the joint was "free and clear of osteoarthritic changes." Dr. Reeder thought that the restriction in lateral motion of the ankle "may loosen up gradually as time passes" and that this restriction appeared to be the sole cause of his pain. Based on this improvement Dr. Reeder withdrew his suggestion that the ankle joint

be fused and recommended that the plaintiff continue wearing the short leg brace to allow so much motion of the foot as possible.

The final medical evidence in the record is a copy of an application filed for plaintiff by Dr. Reeder with the Aetna Life Insurance Company in order to have premiums waived on a life insurance policy with that company, based on total disability. This application dated May 4, 1962, indicated pain and disability in the right leg and in the back, and also that Odom was being seen by Dr. Reeder two to three times each week. There was enclosed with the application a copy of the medical report by Dr. Reeder dated May 4, 1962, which contained the medical history of plaintiff's injuries as outlined above. According to the statement of plaintiff's attorney before the hearing examiner, the premiums on the life insurance policy were waived on the basis of total disability. (Tr. 25).

In addition to his work experience with the fork-lift trucks, plaintiff had also worked on a floating derrick, had done shovel work for the highway department and had worked on a farm. He testified at the hearing that after his injuries he tried to go back to work at Pittsburgh Metallurgical Company to save his seniority but that the personnel manager, after referring him to a company doctor for evaluation, told him that there were no jobs that he would be able to do. He also testified that he had visited the South Carolina Employment Service and was told that he could be a tailor. He then visited three tailoring shops and, according to his testimony, was told by each that they were afraid to hire him because he was too disabled. (Tr. 39). He also said that he had tried to get work as a fork-lift operator but when the prospective employer saw his limp and noticed the leg brace he would not hire plaintiff. Odom did not recall who this prospective employer was or where he was. He stated that he would not be able to work at a job requiring him to stand for any length of time and, similarly, could not sit still and work. He

**736**

says that he is not able to use the bus and cannot drive a car. He had a second grade education and is not able to read. His writing is limited to writing his name and a few figures.

To be entitled to the benefits of the Act plaintiff must show an " * * * inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration." (42 U.S.C.A. §§ 416(i), 423).

█ The Secretary is required to evaluate both the medical evidence and the nonmedical evidence, including the statements and testimony of the plaintiff, and on the basis of all such evidence, decide whether plaintiff has established an inability to engage in employment because of his disability. The plaintiff need not be completely helpless or "bedridden" but he must show a medically determinable physical or mental impairment which, when viewed in context with his age, educational attainments, training and experience, and mental and physical capabilities, renders him unable to engage in substantial gainful work. Teeter v. Flemming, 270 F.2d 871, 77 A.L.R.2d 636 (7th Cir. 1959); Sobel v. Flemming, 178 F.Supp. 891 (E.D.Pa.1959).

Here, the Secretary found that plaintiff was considered unable to return to his former occupation but held that this fact would not meet the statutory test for entitlement since plaintiff must be incapable of performing substantial work in *any* occupation. In spite of the fact that there was considerable evidence that plaintiff had tried to return to his prior job and had on several occasions tried to find other work which he could perform and in each attempt had been unsuccessful, no evidence was brought forward by the Secretary as to what work plaintiff was able to do, if any, and whether this work, if any, is available to him.

██ On the present state of the record, the Court is unable to make a fair and reasonable determination of whether the plaintiff is able to engage in a substantial gainful occupation, and, therefore, the Court is of the opinion that further evidence should be developed with regard to how Odom's impairments limit his capacity for work; and what type of work is available to a man with such capacity. And if, upon thorough reconsideration, the Secretary should find that Odom has the capacity for work, such finding should be supported by precise findings as to the nature of work available to a man of his age, experience, and training, and with his mental and physical impairments. Teeter v. Flemming, 270 F.2d 871 (7th Cir. 1959); Kerner v. Flemming, 283 F.2d 916 (2nd Cir. 1960). In making such findings it should be kept in mind that the theoretical ability to work is not enough if no reasonable opportunity for it is available. Aaron v. Fleming, 168 F.Supp. 291 (M.D.Ala.1958). Compare Underwood v. Ribicoff, 298 F.2d 850 (4th Cir.1962); and, Butler v. Flemming, 288 F.2d 591 (5th Cir. 1961).

The case is accordingly remanded to the Secretary of Health, Education and Welfare, pursuant to Section 205(g) of the Act, (42 U.S.C.A. § 405(g)), with instructions for further proceedings in conformity herewith.

An order will be entered accordingly.